Filed 10/6/25  P. v. Rickner CA1/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FIRST APPELLATE DISTRICT

## DIVISION THREE

| | |
|---|---|
| THE PEOPLE,<br><br>        Plaintiff and Respondent,<br><br>v.<br><br>MATTHEW RICKNER,<br><br>        Defendant and Appellant. | A171421<br><br>(Del Norte County<br>Super. Ct. No. CF249003) |

Defendant Matthew Rickner appeals from a judgment after a jury found him guilty of multiple offenses, including the murder of his mother, and assault with a semiautomatic firearm against his father.  Earlier in the proceedings, the trial court held a competency hearing and found defendant mentally competent to stand trial.  During trial, defense counsel requested that the court suspend criminal proceedings and hold a second competency hearing, but the court declined to do so.  In contending the court's failure to do so violated his due process rights, defendant argues he presented sufficient evidence of a substantial change in circumstances that cast serious doubt on the court's prior competency finding.  We find no error and affirm the judgment.

1

## FACTUAL AND PROCEDURAL BACKGROUND

### A. The Shooting and Investigation

At all relevant times, defendant's parents, Michael and Phyliss Rickner,[1] lived in Crescent City. Defendant previously lived in Sacramento but moved to his parents' home in or around September 2023.

On the evening of December 29, 2023, Phyliss informed Michael that their .45 caliber firearm was missing from their bedroom. Phyliss confronted defendant and demanded return of the gun. She reached for the pockets of defendant's sweatshirt, but he pushed her away and ran out the back door of the home. Michael had not noticed such erratic behavior from defendant prior to that night.

Phyliss called 911 and told the dispatcher that her son was "acting crazy" and "strange," and that a firearm was missing. The dispatcher asked if defendant had a history of strange behavior, and Phyliss answered affirmatively, stating he has "bipolar and schizoaffective disorder" and was "acting erratically" and "imagining things." Phyliss added, "And he's not on any meds." The dispatcher informed Phyliss that officers were on their way.

Phyliss told Michael that defendant had mentioned something about their neighbor, so she went to check on him. Michael eventually found defendant in their backyard patio holding the missing gun. Defendant refused to return it and accused Michael of molesting defendant's son. At one point, defendant cocked the gun and aimed it at Michael. Defendant eventually lowered the gun, put it behind his waistband, and moved to another area of the property.

---

[1] We refer to the family members by their first names to avoid confusion. No disrespect is intended.

Michael received a return call from 911 and requested that officers be sent to the residence. After the dispatcher said officers were on their way, the phone line went dead. It was later revealed that the power cord for the landline had been unplugged.

Michael was near the front door of the residence when Phyliss walked past him and went inside. Michael and the neighbor heard defendant and Phyliss arguing inside the house. Michael heard defendant say, "you've been holding information from me." A gunshot rang out, followed by Phyliss screaming and another shot. Michael and the neighbor ran towards the neighbor's home and heard more gunshots. Michael hid in some nearby bushes and called 911, reporting that defendant had shot Phyliss.

When the police arrived, they found the front door to the Rickners' residence ajar and the home mostly dark. Phyliss was lying on the ground, deceased, with three shell casings near her body. She had suffered multiple gunshot wounds, including a shot to the back of the head.

The police searched the residence and perimeter for defendant but did not find him. A few hours later, highway patrol officers spotted defendant walking along a nearby road. He fled but fell and was apprehended. The officers found a loaded firearm tucked into defendant's waistband, and Michael later identified it as the one missing from their bedroom. During a search of defendant's person, officers found a loaded magazine, a methamphetamine pipe, and a plastic bag containing a white substance that was later determined to be 11 grams of methamphetamine. All spent rounds and casings found at the scene were determined to have been fired by the firearm seized from defendant.

Del Norte County Sheriff's Sergeant Silas Grigsby escorted defendant to a patrol car and "advised him that he was under arrest for murder."

Defendant put his head down and said, "She's gone," even though Grisby had not identified the victim or the victim's gender. Defendant then tried to pull his arm out of Grigsby's grasp and kicked him in the leg, but Grigsby was able to place him into the patrol car.

A search of defendant's bedroom revealed two bottles for antipsychotic medications. One prescription, filled the previous year on November 30, 2022, was for Olanzapine, and the bottle contained 29 of 30 pills. Another bottle found in defendant's bedroom had a May 10, 2022 prescription for 90 pills of Olanzapine and was empty. Three bottles of medication for depression were found in the bedroom with prescription dates in April, May, and November of 2022, and each bottle still contained several pills. A bottle of medication for anxiety was also found, with a prescription date of June 10, 2022, and it contained one pill out of 90.

An autopsy revealed that Phyliss died of multiple gunshot wounds to the head, neck, chest, and back. Several bullets entered through the right side of her chest and right arm but were not fatal. The gunshot wound to the back of the victim's head was "immediately incapacitating," and the pathologist believed this was the last shot fired "because if it occurred first, I don't think you could have then in that position shot her front, side, and back."

### B. Charges

On January 3, 2024, defendant was charged by complaint with murder (Pen. Code,[2] § 187, subd. (a); count one); assault with a semiautomatic firearm (§ 245, subd. (b); count two); grand theft of a firearm (§ 487, subd. (d)(2); count three); disconnecting a telephone line (§ 591; count four); possession of a controlled substance with a loaded firearm (Health & Saf.

---

[2] Further unspecified statutory references are to the Penal Code.

4

Code, § 11370.1, subd. (a); count five); resisting an executive officer (§ 69, subd. (a); count six); misdemeanor resisting a peace officer (§ 148, subd. (a)(1); count seven); and misdemeanor possession of paraphernalia used for smoking controlled substances (Health & Saf. Code, §§ 11370.1, subd. (a), 11364, subd. (a); count eight). As to counts one and two, the complaint alleged various enhancements for firearm use and discharge causing great bodily harm. (§§ 12022.53, subds. (b), (c), (d), 12022.5, subd. (a), 1192.7, subd. (c)(8), 667.5, subd. (c)(8).)

**C. Competency Hearing**

In late January 2025, defendant's appointed counsel, Karen Olson, told the trial court she had met with defendant and was prepared to go forward with the preliminary hearing scheduled for the next day. On the day of the hearing, however, Olson declared doubt as to defendant's mental competency, explaining he had suddenly become "nonresponsive" and "non-verbal" and was "lying under the bed . . . as opposed to being on the bed itself." The trial court had defendant transported to the courtroom, observed his demeanor, and ordered a psychiatric evaluation to be performed by Dr. Kimel Limon.

In February 2024, Dr. Limon submitted two forensic evaluation reports stating her opinion that defendant was not competent to stand trial. In her revised report, Dr. Limon explained that defendant was evaluated twice in February 2024, but "did not respond to questions" and "refused to be interviewed." Dr. Limon based her opinions on court records, police reports, and discussions with defense counsel.[3] Dr. Limon also highlighted the

---

[3] Dr. Limon included Olson's reports that defendant "presented with bizarre thoughts related to celestial beings and not being physically present (e.g., out of body experience)," and that his speech was awkward (e.g., " 'Fine, I am' "), his mood was incongruent with his speech, and he was lying in an awkward position under his bunk on the floor.

5

statements by Phyliss that defendant had a history of bipolar and schizoaffective disorders and "was experiencing an increase in delusions and hallucinations," with "uncertain" medication compliance.

Dr. Limon's revised report included a sheriff's incident narrative from January 2024 that defendant went on a "hunger strike" for several days and became "verbally nonresponsive to others including the staff and other inmates." He requested to be prescribed Olanzapine, but the request "was denied by the provider for unknown reasons." Defendant was also reported to have "ongoing bizarre behavior" including blocking an officer's pathway to the stairs, being "verbally nonresponsive," and "engag[ing] in a blank star[e]."

According to Dr. Limon, defendant "responded to a few questions, but was soft spoken and hard to understand. He stopped talking, stared and refused to respond to any further questions during the first visit. During the second visit, he was located in an observation cell. He mumbled something and when asked to speak up he yelled 'I don't know what is going on.' He subsequently disengaged and refused to speak." Dr. Limon opined that defendant met diagnostic criteria for a mental disorder of "Unspecified Schizophrenia Spectrum and Other Psychotic Disorder and Unspecified Bipolar and Related Disorder," and that his history of methamphetamine use "may produce psychotic symptoms similar to Schizophrenia." Dr. Limon acknowledged "[t]here is currently not enough information to provide a more specific diagnosis."

Regarding the possibility that defendant was malingering, Dr. Limon acknowledged that defendant "was not formally assessed for feigning mental illness as he refused to participate in the evaluation." However, Dr. Limon remarked, "There was no evidence to suggest that [defendant] was feigning mental illness."

Dr. Limon opined that defendant "is in a decompensated state and is not currently prescribed medications. It's likely that his mental illness interferes with his current ability to stand trial." Dr. Limon further opined that defendant's understanding of the nature of the legal proceedings was "impaired" because he has "poor insight into his mental illness," and that his selective muteness, particularly with counsel, precluded his "having a rational, meaningful discussion with his attorney regarding his set of legal circumstances."

On February 21, 2024, the trial court held a competency hearing. Both sides waived a jury trial and agreed Dr. Limon's revised report could be submitted in lieu of her testimony. Sergeant Grigsby testified regarding defendant's conduct during his arrest, including his remark, "She's gone," when told he was arrested for murder. Michael testified that when defendant moved back into the parents' home in September 2023, he worked for Michael, a commercial fisherman, and was a good worker and fast learner. Michael had never previously seen defendant act in a nonresponsive manner as he had after his arrest and believed that defendant was putting on an "act." Del Norte County Sheriff's Deputy Leann McClaflin testified that in her interview of defendant after his arrest, defendant said he assumed she was a detective and twice asked for an attorney. McClaflin found defendant to be coherent and appropriately responsive.

The trial court found that defendant was competent to stand trial, and that he was feigning incompetence. The court reinstated criminal proceedings and denied Olson's subsequent request to be relieved as counsel.[4]

---

[4] The minute order reflects that during the competency hearing, "[a]n incident" occurred "which resulted in the Defendant being further restrained by jail staff."

7

In March 2024, the district attorney filed an information containing the same counts and allegations as the complaint.

**D. Trial Proceedings**

Trial commenced in May 2024. At the outset of trial, prosecutor Todd Zocchi suggested the trial court preemptively admonish defendant about disruptive courtroom behavior because, at the conclusion of the preliminary hearing, defendant had "acted as if he was going to headbutt Detective Balch." In response, Olson argued an admonition might "trigger my client more than make things smoother," and she noted defendant's behavior had improved since the preliminary hearing. Specifically, Olson explained that, despite defendant's earlier "noncommunicative" and "aggressive" behaviors, she has since been able to speak with him and they had met three times.

### 1. *Olson's Second Declaration of Doubt*

On the third day of trial (May 23, 2024), as the prosecution neared the end of its case in chief, Olson told the trial court that during her jail visit with defendant that day, "it became evident to me that his understanding of the proceedings and the charges that are levied against him is questionable. I think he is decomposing. I can't put my finger on it, but he is unable to track questions that I've posed with him, to assimilate information, and respond accordingly." Olson felt defendant had "some competency issues," especially in relation to his ability to assist in his defense because she could not "get him to focus or concentrate or even give me simple answers in response to simple questions regarding the state of the evidence and the charges against him and what that means."

As an example, Olson stated she "explained some legal issues to him, asked him a specific question whether he understood what I was telling him, and his response to me with a hand gesture was, 'Subpoena.' [¶] So that's

8

similar to what I got today with respect to talking to him about an option to have him testify, what I would be questioning him about. And his focus was on me subpoenaing Axon or the body camera footage from officers that have testified. [¶] I told him I've already—I have those. We've seen some of them. But he insisted that it needed to be subpoenaed. And then also implied that he should be questioning my relationship with Mr. Zocchi and whether I'm working for the prosecution." The trial court suggested defendant was mistaking the fact that "both of you have used first names in the courtroom with each other" as a basis to question counsel's representation of him.

Olson further told the trial court about a discussion she had had with a bailiff and defendant's "questionable behavior and responses" that were "way out there." The trial court asked the bailiff about this incident, and he explained that "defendant was messing with the tablet. So I told him to not mess with the tablet, and he responded with, 'Pearcey, you need to get off your high horse.' [¶] So then I said, 'No high horse here.' [¶] And then he said something about a sushi bar or something." Asked by the court if it appeared "that he's disoriented or he's just messing with you," the bailiff responded, "I think there's some messing around."

Zocchi argued that defendant's "subpoena" request was rational because he appeared to be telling Olson "to subpoena something." Olson agreed this was an accurate account "for that particular moment" but indicated defendant later repeated that request and would "not directly answer questions that I pose to him to try to elicit whether or not he completely understands what's going on." When pressed by the court for more specifics, Olson explained, "I went in today, and this is what really made me focus on whether he's competent, and explained to him his right to not testify, explained to him my thoughts on a defense of voluntary

9

intoxication, asked him if he understood what I was talking about. And instead of answering in a yes or no, he went into a speech about things that I should know, meaning me, things that you should know, put a finger up to his lips like it was a secret. And then discontinued talking and stared at me. [¶] So I tried again to talk to him about whether or not he's willing to testify. He questioned why I would want him to do that. And I tried to explain to him that it's not my choice whether he testifies or not; it's his choice. But there's some advantages and disadvantages that, obviously, come along with that. [¶] He then went into a, for lack of a better term, a request and said that he is concerned about the other charges and wanting those to be dismissed and wanting me to subpoena Axon video to support the fact that there was no PC 69 committed. [¶] I tried to explain to him that those charges were the least of my concerns at the moment, trying to talk to him to find out whether or not I feel he has the ability and also trying to get some factual statements from him to see if I'm on the right track, and could not get him to answer in any specific manner to the questions I was posing about the factual situation."

The trial court concluded there was no substantial change of circumstances or new evidence that cast serious doubt on the validity of the court's prior finding of defendant's competence. The court found that, if anything, "there appears to be a change in the better. He's communicating with Ms. Olson, frankly. And they appear to be logical to me in the context he wants other [mobile video audio recording system (MVAR)] on a Penal Code 69, which is one of the charges. It really is. And not all the MVARs have been shown. That's for sure. I've not seen the full MVARs of all these cases. And I doubt very much the defendant has either, nor anybody, frankly, at this point, but maybe the law enforcement officers themselves. If

10

he wants additional records subpoenaed, that's an intelligent thing to request.  Even during trial you have that right.  [¶] He has concerns that the counsels are too familiar with each other.  They are calling each other by their first names.  I noted that the first day in court.  I think I said that in open court just recently about how familiar the parties are.  I normally don't see that in trials.  Usually last names used.  But instead it's been first names.  That's a logical response from the defendant. . . .  [¶] Then it's clear to me that he's not delusional.  He has a computer right in front him.  I know inmates don't have computers in front of them in their cells in Del Norte County, and he's decided, apparently, to mess with the computer, told Officer Pearcey to get off his high horse and made some crack about wanting sushi, which I take is a logical joke that most people would crack about.  I mean, we have dine and—dine and dash services and things of that nature.  [¶] So all that appears to the court to be extremely logical, not a change in circumstances for the worse, but clearly for the better."

### 2. Marsden *Motion*

The following day, May 24, 2024, the trial court and counsel met for a preliminary discussion on jury instructions.  The court first memorialized the parties' stipulation to off-the-record discussions about potential jury instructions before indicating that defendant had made a motion under *People v. Marsden* (1970) 2 Cal.3d 118 (*Marsden*) for the appointment of new counsel.  The court held a *Marsden* hearing, during which defendant explained that he did not feel Olson's representation had been beneficial, and that outstanding evidence had not been provided by the prosecution.  The court denied the *Marsden* motion and resumed trial proceedings.

During an ensuing discussion between the trial court and counsel, Olson remarked, "There may be a slim chance that my client testifies.  I don't

11

believe that's going to be the case at this point in time." Defendant interjected, "Oh, it's going to fucking happen now." Shortly thereafter, while the court and counsel discussed the instruction for assault with a semiautomatic firearm, defendant interrupted Zocchi, stating, "No. You already done disrespecting me multiple times. I have remained cool throughout this whole process. Shut your fucking mouth." The following exchange then occurred:

"THE DEFENDANT: I'm not even moving. You're the one jerking me around, dude. My hands are open.

THE BAILIFF: You can't do that.

THE DEFENDANT: My hands are open. You see that? My hands are fucking open. That's right. My hands are open.

THE BAILIFF: Okay.

THE DEFENDANT: You going to drag her up from that pit? [¶] You already done fucked up by saying my salmon was good. You were referring to my ex.

THE BAILIFF: Hey, Rickner—

THE DEFENDANT: I've fucking had enough of your fucking mouth.

THE COURT: Record it all, please.

THE DEFENDANT: I bit my fucking tongue. I have had enough. Fucking do something. Do your fucking job."

The trial court noted defendant had "started to stand up when handcuffed. He was told to remain seated. Appeared to remain seated." Defendant stated, "Mess with my fucking kids. You can just fuck off. [¶] If you won't put me in a wreck with that fool, then I will fuck one of your guards off. You should have never brought them in."

Following a short recess, the trial court announced on the record that defendant "voluntarily absented himself due to his conduct whereby he threatened to kill one of the officers and unfortunately started to stand up towards them and then started making various threats." Zocchi moved to shackle defendant for the remainder of the trial proceedings, but the court said it would not rule on the motion without defendant present. The court further remarked, "I don't know if he heard me during his threats to the officers or not in an attempt to calm him down. Apparently, he did not calm down. He was quite upset over the ruling I gave in *Marsden*, which is what appears to have really set him off. He's simply aggravated over the court's ruling."

### 3. *Motion to Shackle*

At the next session of trial on May 28, 2024, the trial court began by noting that defendant was "refusing to attend." With a pending hearing on the prosecutor's motion to shackle, Olson agreed to attempt to procure defendant's presence. After a short recess, defendant returned to the courtroom. When the prosecutor requested that defendant be placed in restraints for the remainder of the case, the following transpired:

"THE DEFENDANT: Oh, I stood up, and you got pissy; huh?

THE COURT: Okay. Stop right there. Stop right there.

THE DEFENDANT: Where is that huge bag?

THE COURT: I am now going to advise the defendant that if he continues to interrupt—

THE DEFENDANT: Give me contempt of court.

THE COURT: —I'll have him removed, and it will be held as a voluntary absence."

Zocchi then read from a correctional officer's report regarding an incident that occurred at the jail where defendant was housed. During Zocchi's reading, defendant interrupted several times, stating he did not threaten to kill one of the correctional officers. The trial court admonished defendant, "You continue to interrupt, you will be removed, and the trial will continue." Defendant responded, "That's fine. We can continue the trial then. Let's get all the evidence on the table that's being withheld." After further interruptions from defendant, the court ordered his removal from the courtroom.

The hearing on the motion to shackle continued with Zocchi reading further from the correctional officer's report. According to the report, defendant made " 'multiple vulgar statements about Officer Pearcey, he stated he planned to go off in court again.' " When the officer asked defendant for clarification, defendant " 'stated he went off in court today, (May 24th, 2024), and will do it again on Tuesday, which he believes to be his next court appearance.' " It was further reported that defendant asked an officer to find Pearcey " 'so that they could go to the rec. and fight,' " and added, " ' "Better bring those two midgets." ' "

After further argument, the trial court granted the motion to shackle defendant. In so ruling, the court noted that one of the reasons for its decision was that during the proceedings, defendant's demeanor had "appeared cold" and his disruptive behavior appeared "calculated" as "he smiled at the court with a smirk while he was doing so." With regard to defendant's calling the individuals who were with Pearcey midgets, the court observed "Mr. Pearcey stands well over six feet tall, is a very muscular man, and the other two officers that were with him were probably a foot shorter

14

each when the outburst occurred last week." In sum, the court found that "all these comments appear to be reasonable and calculated."

Defendant eventually took the witness stand against his counsel's advice but merely stated, "I don't really have nothing to say right now. I'm still waiting for all the evidence to be brought forward."

### E. Judgment and Sentence

The jury found defendant guilty on all counts and also found true the allegations regarding firearm use and aggravating factors. The trial court sentenced defendant to 40 years to life and to a determinate term of 20 years and eight months.

Defendant timely appealed.

## DISCUSSION

"Both the due process clause of the Fourteenth Amendment to the United States Constitution and state law prohibit the state from trying or convicting a criminal defendant while he or she is mentally incompetent." (*People v. Rogers* (2006) 39 Cal.4th 826, 846–847 (*Rogers*).) "If, during the pendency of an action and prior to judgment, . . . a doubt arises in the mind of the judge as to the mental competence of the defendant, the judge shall state that doubt in the record and inquire of the attorney for the defendant whether, in the opinion of the attorney, the defendant is mentally competent." (§ 1368, subd. (a).) "If counsel informs the court that they believe the defendant is or may be mentally incompetent, the court shall order that the question of the defendant's mental competence is to be determined pursuant to Sections 1368.1 and 1369." (*Id.*, subd. (b).) "The court's duty to conduct a competency hearing may arise at any time prior to judgment." (*Rogers*, at p. 847.)

15

A defendant is presumed to be competent (*People v. Huggins* (2006) 38 Cal.4th 175, 191 (*Huggins*)) and has the burden of proving incompetency by a preponderance of the evidence (§ 1369, subd. (c)(3); *People v. Medina* (1990) 51 Cal.3d 870, 881–886).  "A defendant is incompetent to stand trial if he or she lacks a ' "sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding—and . . . a rational as well as a factual understanding of the proceedings against him." ' " (*Rogers*, *supra*, 39 Cal.4th at pp. 846–847.)

 " 'When the accused presents substantial evidence of incompetence, due process requires that the trial court conduct a full competency hearing. [Citation.]  "Evidence is 'substantial' if it raises a reasonable doubt about the defendant's competence to stand trial." ' [Citation.]  Absent substantial evidence of a defendant's incompetence, 'the decision to order such a hearing [is] left to the court's discretion.' " (*People v. Panah* (2005) 35 Cal.4th 395, 432.)  "Evidence of incompetence may emanate from several sources, including the defendant's demeanor, irrational behavior, and prior mental evaluations." (*Rogers*, *supra*, 39 Cal.4th at p. 847.)  However, to be entitled to a competency hearing, "a defendant must exhibit more than bizarre, paranoid behavior, strange words, or a preexisting psychiatric condition that has little bearing on the question of whether the defendant can assist his defense counsel." (*People v. Ramos* (2004) 34 Cal.4th 494, 508 (*Ramos*).)

 "[A] reviewing court generally gives great deference to a trial court's decision whether to hold a competency hearing," as ' "[a]n appellate court is in no position to appraise a defendant's conduct in the trial court as indicating insanity, a calculated attempt to feign insanity and delay the proceedings, or sheer temper." ' " (*People v. Marshall* (1997) 15 Cal.4th 1, 33.)  "On appeal, the reviewing court determines whether substantial evidence,

viewed in the light most favorable to the verdict, supports the trial court's finding." (*People v. Lawley* (2002) 27 Cal.4th 102, 131.)

In this case, defendant challenges the trial court's refusal to hold a second competency hearing after defense counsel declared doubt as to his competency on the third day of trial. "When a competency hearing has already been held and defendant has been found competent to stand trial, . . . a trial court need not suspend proceedings to conduct a second competency hearing unless it 'is presented with a substantial change of circumstances or with new evidence' casting a serious doubt on the validity of that finding." (*People v. Jones* (1991) 53 Cal.3d 1115, 1153 (*Jones*).) "[T]he duty to suspend is not triggered by information that substantially duplicates evidence already considered at an earlier, formal inquiry into the defendant's competence; when faced with evidence of relatively minor changes in the defendant's mental state, the court may rely on a prior competence finding rather than convening a new hearing to cover largely the same ground." (*People v. Rodas* (2018) 6 Cal.5th 219, 234–235 (*Rodas*).)

In making the determination whether to hold a second competency hearing, " 'the trial court may appropriately take its personal observations into account . . . ,' particularly if the defendant has 'actively participated in the trial' and the trial court has had the opportunity to observe and converse with the defendant." (*Rodas*, *supra*, 6 Cal.5th at p. 234.) "We apply a deferential standard of review to a trial court's ruling concerning whether another competency hearing must be held. [Citation.] We review such a determination for substantial evidence in support of it." (*Huggins*, supra, 38 Cal.4th at p. 220.)

With these authorities in mind, we turn to the facts of this case. As recounted above, Olson's chief concern on the third day of trial was

defendant's perceived inability to respond to her questions, which caused her to again question whether he understood the nature of the proceedings and the charges against him. We agree with the trial court that Olson did not present a " 'substantial change of circumstances' " (*Jones*, *supra*, 53 Cal.3d at p. 1153) from the first competency hearing, which was also based on defendant's overall nonresponsiveness to Olson and others. That defendant's communication with counsel improved somewhat in the interim does not cause us to conclude otherwise, as the record reflects defendant intermittently engaged in coherent interactions with various people throughout the criminal proceedings.

Likewise, Olson's mere belief that defendant was decompensating during trial was insufficient to compel the trial court to suspend criminal proceedings and hold a second competency hearing. "A declaration of doubt by counsel alone is not sufficient to trigger a statutory right to a competency hearing. Section 1368 is written in terms of whether a doubt arises in the mind of the trial judge and is then confirmed by defense counsel." (*People v. Garcia* (2008) 159 Cal.App.4th 163, 170.) Granted, there was evidence in the record that defendant was bipolar and had schizoaffective disorder (e.g., Phyliss's statements in the 911 call), but this evidence was already known at the time of the first competency hearing, and there was no new evidence suggesting defendant's conduct during trial was attributable to a worsening mental or emotional state. "[E]ven a history of serious mental illness does not necessarily constitute substantial evidence of incompetence that would require a court to declare a doubt concerning a defendant's competence and to conduct a hearing on that issue." (*People v. Blair* (2005) 36 Cal.4th 686, 714, citing *Ramos*, *supra*, 34 Cal.4th at p. 508; see also *People v. Buenrostro* (2018) 6 Cal.5th 367, 389 [" 'a defendant who refuses to work with his lawyer out of

spite alone is not incompetent,' for example, 'even if that defendant has a serious mental disease or defect' "].)

Defendant insists his decompensating mental state was evidenced by his "bizarre" conduct and remarks during trial. In defendant's view, his "disjointed, incoherent references to matters that were wholly unrelated to the proceedings provide direct evidence . . . of an inability to comprehend or assist in his own defense." We are not convinced. " '[M]ore is required to raise a doubt [as to a defendant's competence] than mere bizarre actions [citation] or bizarre statements [citation] or statements of defense counsel that defendant is incapable of cooperating in his defense.' " (*People v. Ramirez* (2006) 39 Cal.4th 398, 431.) For example, in a case involving similar circumstances, the California Supreme Court held the "[d]efendant's cursing and disruptive actions displayed an unwillingness to assist in his defense, but did not necessarily bear on his *competence* to do so, or reflect a substantial change of circumstances or new evidence casting serious doubt on the validity of the prior finding of the defendant's competence." (*People v. Medina* (1995) 11 Cal.4th 694, 735.)

Meanwhile, there was ample evidence supporting the trial court's conclusion that defendant had the ability both to consult with counsel if he were so inclined and to understand the proceedings and charges against him. (*Rogers*, *supra*, 39 Cal.4th at pp. 846–847.) Defendant's flight from police, his apt response to being told he was under arrest for murder ("She's gone"), and his refusal to be interrogated by someone he identified as a detective without an attorney present demonstrated an awareness of his actions and the proceedings brought against him. Notably, in conversations with defense counsel, defendant specifically referenced the charge under section 69 for resisting an executive officer and appeared to believe that subpoenaing

19

additional body cam footage would yield exculpatory evidence on this count.[5] Many of defendant's remarks during trial, though disruptive, demonstrated an understanding of the roles of the judge, prosecutor, and defense counsel. His suggestion that Olson "subpoena" additional body cam footage from the prosecution reflected his awareness that Olson represented him and made decisions about what evidence to obtain in his defense. His attempt to complete the trial court's sentence by saying he could be held in "contempt of court" for his continued interruptions demonstrated an awareness of the disruptiveness of his actions and the judge's authority in maintaining order over the proceedings. Even his suspicion that Olson was working for the prosecution reflected an understanding of her role as his representative in an adversarial process. And as the trial court reasonably noted, the accusation seemed to logically stem from Zocchi's practice of referring to Olson by her first name during formal trial proceedings.

Moreover, many of defendant's remarks during trial were not, as he claims, "wholly unrelated to the proceedings" when viewed in context and with deference to the trial court. For instance, defendant's outbursts regarding his "kids" and his "ex" came after Michael's testimony denying his molestation of defendant's children by pointing out that defendant or his ex-

---

[5] Defendant insists this was not a rational request to subpoena *additional* footage but an irrational request for the *same* footage that had already been shown at trial. Setting aside whether this perceived difference logically bore on the issue of competency, our review of the record does not disclose that defendant made such a clear distinction in his subpoena request to Olson. Meanwhile, at other times, defendant expressed his concerns regarding evidence that "has not been provided by the prosecution" or was being "withheld," and it is undisputed the prosecution had not shown the full MVAR footage at trial. On this record, the trial court could reasonably conclude defendant was asking Olson to subpoena additional, not duplicative, evidence.

girlfriend (the children's mother) were always around when Michael saw the children.  Defendant's "sushi" remark to the bailiff appeared to be an attempt, in jest, to order food from a court tablet.  On this point, the bailiff indicated there was "some messing around" during this exchange, and the cold appellate record sheds no light on defendant's demeanor when he made this remark.  Viewed in a light most favorable to the court's decision, defendant's remarks, though disruptive, had a logical connection to what was happening during trial.

Many of defendant's other outbursts were consistent with his general hostility toward law enforcement.  The record is replete with defendant's attempts to goad and physically attack law enforcement officers.  He attacked Sergeant Grigsby during his arrest, and he attempted to headbutt a detective at the preliminary hearing.  Upset by the denial of his *Marsden* motion, defendant threatened to "fuck one of your guards off."  In the sheriff's report cited in support of the shackling motion, defendant was reported as having demanded that he and Officer Pearcey " 'go to the rec. and fight.' " Defendant's reference to "midgets" was, in the trial court's reasonable view, simply an offensive term directed against two officers who were shorter than the main target of his hostility, Officer Pearcey.  Defendant's outbursts may have shown that he "was angry and upset, and perhaps that he wished to interrupt the proceedings, but it was not evidence sufficient to require the trial court to conduct a mental competency hearing." (*People v.  Elliot* (2012) 53 Cal.4th 535, 583.)

Critically, the record also contains more direct evidence that defendant's outbursts were part of a calculated attempt to disrupt the proceedings.  As the prosecutor noted in support of the shackling motion, defendant was reported as saying he " '*planned* to go off in court *again*' " on

21

the next scheduled trial date, just as he had done at the prior session.  (Italics added.)  The court also stated for the record that defendant's disruptive behavior appeared "calculated" because "he smiled at the court with a smirk while he was doing so."  Such personal observations are properly taken into account by a court in deciding whether to order a second competency motion. (*Rodas*, *supra*, 6 Cal.5th at p. 234.)  In sum, the trial court was in a position far better than this court to evaluate how defendant's behavior bore on the question of his competence to stand trial.

Defendant's remaining arguments are similarly unavailing.  He cites *Rodas* for the proposition that a second competency hearing was required because it is "possible" his failure to take antipsychotic medication was causing him to decompensate over time.  *Rodas* is distinguishable.  There, the defendant was initially found to be mentally incompetent and was ordered to a state hospital where he was treated for several months with antipsychotic medication.  (*Rodas*, *supra*, 6 Cal.5th at pp. 230–231.)  At the start of the jury trial a few months later, the trial court denied a request for a second competency hearing despite learning that defendant "had stopped taking antipsychotic medication—on which his prior competence finding was effectively conditioned—and was again displaying symptoms similar to those he exhibited during prior bouts of incompetence."  (*Id.* at p. 235.)  In holding there was a substantial change in circumstances that compelled a second competency hearing, the Supreme Court reasoned that the defendant's stoppage of medication and reversion to past symptoms "painted a starkly different picture from that contained in the medical director's certification" that supported the prior competency finding.  (*Ibid.*)

Here, in contrast, the prior finding of defendant's competency was not conditioned on his remaining medicated.  As the trial court found at the

February 2024 competency hearing, defendant had apparently stopped taking his antipsychotic medication many months before, as far back as November 2022. Nothing in the record suggests that defendant resumed and then discontinued taking antipsychotic medication during his time in custody. Thus, unlike the situation in *Rodas*, there were no changed circumstances with respect to defendant's medication use (or nonuse) between the first competency hearing and Olson's second declaration of doubt.

Defendant insists the trial court's finding that he stopped taking his antipsychotic medication some time ago "had no solid basis in the evidence." In defendant's view, the fact that Phyliss thought to tell the 911 dispatcher that defendant was not on any meds "under such stressful circumstances seems to indicate that his failure to do was a fairly recent event." We again are not convinced, as nothing in Phyliss's statement to the 911 dispatcher ("And he's not on any meds") compels the conclusion that she was reporting a recent stoppage in defendant's medication use. In any event, on substantial evidence review, we accept all evidence that supports the trial court's decision and disregard the contrary evidence. (*Harley-Davidson, Inc. v. Franchise Tax Bd.* (2015) 237 Cal.App.4th 193, 213.) Here, the evidence that defendant's most recent prescription bottle for antipsychotic medication was dated November 2022 and was nearly full reasonably supported the court's finding that defendant had stopped taking the medication long before the first competency hearing. Thus, the court could reasonably conclude defendant's unruly behavior during trial was not attributable to any recent cessation in medication use.

Finally, defendant contends the evidence supporting the trial court's original competence finding—e.g., defendant's flight during his arrest, his

23

requests for an attorney, and Michael's belief that defendant was malingering—was not "particularly compelling." Starting from that premise, defendant argues "the original finding of competence can hardly be said to have been based on such solid evidence as to make a substantial change in circumstance unlikely." To be clear, defendant's appeal is reasonably understood as a challenge to the trial court's refusal to hold a second competency hearing, not to its initial finding of competence. Thus, he has forfeited any argument on the latter issue. (*People v. Stanley* (1995) 10 Cal.4th 764, 793.) Nor does defendant cite any authority suggesting that the threshold for proving a substantial change in circumstances for a second competency hearing is reduced where the evidence on the initial competence finding is perceived as not "particularly compelling."

In any event, we are satisfied the trial court's original competence finding and its decision declining a second competency hearing were both adequately supported by substantial evidence for the reasons discussed. That Dr. Limon found defendant to be incompetent was not dispositive. As recounted, substantial evidence supported the court's conclusion that defendant was malingering, and Dr. Limon had not formally tested defendant on that topic.

## DISPOSITION

The judgment is affirmed.

_____
Fujisaki, Acting P.J.

WE CONCUR:


_____
Petrou, J.


_____
Rodríguez, J.


*People v. Rickner* (A171421)

25